IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

CAROLYN D. JOHNSON,

      Plaintiff,

vs.                            Case No.: 4:11cv403-CAS

MICHAEL J. ASTRUE,
Commissioner of the
Social Security Administration,

      Defendant.

_____/

**MEMORANDUM OPINION**

      This is a social security case referred to me upon consent of the parties and reference by District Chief Judge M. Casey Rodgers.  Doc. 13.  It is concluded that the decision of the Commissioner should be affirmed.

**I.      PROCEDURAL HISTORY**

      On March 24, 2009, Plaintiff filed an application for supplemental security income (SSI), alleging her disability beginning March 1, 2009.  R. 37-38, 137.[1]  The claim was denied initially on July 22, 2009, and upon reconsideration on October 15, 2009.  Thereafter, Plaintiff filed a written request for hearing before an Administrative Law Judge (ALJ) on November 1, 2009.

_____

     [1]  All references to the Record shall be by the symbol R. followed by page reference appearing on the lower right-hand corner of each page of the Record.

A hearing was held on December 1, 2010, in Tallahassee, Florida.  Plaintiff was represented by attorney Joe Durrett.  Plaintiff testified and Gail E. Jarrell presented vocational testimony at the ALJ's request.

On February 3, 2011, the ALJ issued a Decision in which he found Plaintiff "not disabled," as defined under the Act, at any time through the date of his Decision.  R. 25.

Plaintiff requested review of the unfavorable Decision and filed a memorandum in support.  R. 8, 199-201.  On June 15, 2011, the Appeals Council denied Plaintiff's request for review.  R. 1-5.  Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this Court.  20 C.F.R. § 416.1481.  This appeal followed.

## II.   FINDINGS OF THE ALJ

In his written Decision, the ALJ made several findings relative to the issues raised in this appeal:

1.   Plaintiff has not engaged in substantial gainful activity since March 24, 2009.

2.   Plaintiff has several "severe impairments: lumbar degenerative disc disease status post-total laminectomy and fusion; and, obesity."

3.   Plaintiff "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in" 20 C.F.R. Part 404, Subpart P, Appendix 1.

4.   Based on Plaintiff's residual functional capacity (RFC), Plaintiff can "perform a reduced range of light work as defined in 20 CFR 416.967(b)" and "work activities must be consistent with the following criteria: no more than occasional climbing, balancing, stooping, kneeling, crouching and crawling."

5.   "Transferability of job skills is not an issue because the [Plaintiff] does not have past relevant work."

6. Considering Plaintiff's "age, education, work experience, and [RFC], there are jobs existing in significant numbers in the national economy that the [Plaintiff] can perform."

7. Plaintiff has not been under a disability since March 24, 2009, the date the application was filed.

## III.   STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).  ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles."  Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991).  As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence.  42 U.S.C. § 405(g); Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998); Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v.

NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at

1439.  The court may not decide the facts anew, reweigh the evidence, or substitute its

judgment for that of the Commissioner.  Martin v. Sullivan, 894 F.2d 1520, 1529 (11th

Cir. 1990) (citations omitted).  Even if the evidence preponderates against the

Commissioner's decision, the decision must be affirmed if supported by substantial

evidence.  Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  To qualify as

a disability the physical or mental impairment must be so severe that the claimant is not

only unable to do his previous work, "but cannot, considering his age, education, and

work experience, engage in any other kind of substantial gainful work which exists in the

national economy." Id. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 416.920(a)–(g), the Commissioner analyzes a disability

claim in five steps:

1.  If the claimant is performing substantial gainful activity, he is not disabled.

2.  If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3.  If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of

any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.  If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

5.  Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his residual functional capacity and vocational factors, he is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps

him from performing his past work.  20 C.F.R. § 416.912.  If the claimant establishes

such an impairment, the burden shifts to the Commissioner at step five to show the

existence of other jobs in the national economy which, given the claimant's

impairments, the claimant can perform.  MacGregor v. Bowen, 786 F.2d 1050, 1052

(11th Cir. 1986).  If the Commissioner carries this burden, the claimant must then prove

he cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d

1007, 1011 (11th Cir. 1987).

## IV.    RELEVANT MEDICAL HISTORY

## A.    Treatment Prior to and After the Date Plaintiff Alleges Disability

As noted by Plaintiff's counsel, historical medical evidence is not included in the

administrative record.  Doc. 16 at 2.  According to a June 18, 2009, consultative

examination report of Iqbal A. Faruqui, M.D., Plaintiff reported stating, under the

heading "chronic back pain," that

in 1985 she was working in a restaurant and she fell against a sink while she was washing dishes and had immediate pain.  She was taken to the emergency room where [a] pain medication shot was given and she was discharged home and the pain medicine helped temporarily.  She then reported to her employer and she

was sent to Michael Walker and [sic] orthopedic who she reports that after examining [her] put her in the hospital for possibly about a week and did different tests including MRI, myelogram, etc.  Then she was referred to neurosurgeon

Dr. Stringer who did some more tests and decided to do surgery.  She had her first surgery in 1986 with no relief.  She had physical therapy for about a year and continued to have pain.  Then Workman's Compensation sent her to a neurologist in Tallahassee [,] Dr. True Martin [,] who examined her and did some nerve conduction tests and told her that she needed to lose about 50-pounds and go back to work.  She reports that after [the] accident she has gained some weight.  She reports that she tried to loose [sic] weight and did [have] about 45-pounds weight loss but continued to have pain and could not go back to work.  There was no sign of improvement.  Workman's Compensation then referred her to another doctor Dr. Michael Rohan an orthopedic in Panama City who repeated testing including MRI, x-ray, myelogram, and nerve conduction tests and advised that she needed a second surgery for fusion, which she has [sic] in 1989.  Again this intervention also did not help.  She had physical therapy for one and a half to two years without significant improvement.  He then told her that she cannot have any more surgery and offered her epidural shots, which she had times three without help.  After that he has been giving her cortisone shots about every two months, which are giving her temporary relief.  She saw him for about three to four years and finally settled with Workman's Compensation in 2007.  Since then she has been seeing a nurse practitioner at the health department [Florida Department of Health, Liberty Community Clinic (clinic)] for her pain management.  She has never seen a chiropractor.

Claimant reports that her pain gets worse with sneezing, coughing, getting up or down, prolonged walking, picking up more than 15-pounds, bending over, reaching out.  Just about any kind of sudden movement.  She reports that at times her pain radiates to her left leg on the lateral side down to her foot and she feels that her left foot is heavy as if her shoe and sock is tight when actually it is not tight.  She reports that pain improves with heating pad very little and change in position helps some.  Resting helps but warm shower does not help.  R. 258-59.[2]

---

[2] The radiologist, in a July 22, 1991, lumbar spine MRI report, noted several impressions:

1. Status post total laminectomy and spinal fusion changes at L4-5 and L5-S1.  Abnormal intermediate signal intensity areas centrally and to the left of midline in the anterior epidural space at L4-5 and L5-S1 both of which intense contrast enhancement are most consistent with post operative epidural scar formation.

Plaintiff reported to Dr. Faruqui "that she can sit for about 10-15 minutes and then starts having pain."  R. 259.  "She can stand for about 20-minutes and has pain in low back and sometimes radiates to left leg and like her left leg will give out under her." "She can walk for about 200-300 yards.  She can walk for five to ten minutes at a time and then she has to rest a couple of minutes and then she can walk another five to seven minutes."  "When she goes for shopping she usually leans on [a] buggy.  She can shop for about 30-45 minutes on a slow pace.  At home she has [sic] her mother doing dishes, which she can do for about five minutes.  She takes a lot of time because she is slow.  She cannot do vacuuming or cleaning and her sister usually does that."  R. 259.

Progress notes from approximately 2007 through May 2009, reflect that Plaintiff received ongoing treatment for elevated blood pressure despite medication, and other conditions at the clinic.  R. 214-56, 286, 314, 320.  Plaintiff sought treatment for back pain in July 2007 and January to February 2008.  She received injections of Toradol for pain and Phenergan for nausea, along with prescriptions for Flexeril, Naprosyn, and Ultram.  R. 228, 232, 235.

In July 2008, Plaintiff reported her medications were not helping with her back pain and her back pain flared up because she was doing a lot of pulling of her elderly mother, who was recovering from hip surgery.  Flexeril was prescribed.  R. 223.

2. Minimal anterior subluxation at L5-S1 with the patient in the supine position required for MRI.  Flexion and extension views of the L5-S1 level may prove useful for further evaluation to evaluate stability of the previous spinal fusion.

3. There are some mild degenerative disc changes at other levels but no evidence of stenosis or disc herniation.  R. 203.

In November 2008, Plaintiff was prescribed Buspar with a trial of Seroquel for anxiety leading to stomach upset.  R. 220.  In December 2008, Plaintiff reported difficulty sleeping with increased low back pain and muscle spasm.  She was diagnosed with low back pain and anxiety, with continuing prescriptions for Buspar, Amitriptyline, Tramadol, and Flexeril.  R. 219.

In March 2009, Plaintiff sought treatment for back pain, which made it hard to move around, with pain of 7/10 when sitting, but worse when she gets up.  Plaintiff was noted to have a history of underlying back problems and prior back surgery.  Plaintiff had 4-5 strength in the lower left extremity, decreased sensation in the lower left extremity, and tenderness in the lumbar spine.  She was diagnosed with a lumbar strain with acute exacerbation and was given an injection of Decadron and Toradol for pain control with a prescription for steroids, Tramadol, and Flexeril.  R. 215.

In August 2009, Plaintiff again complained of low back pain, and muscle spasm at L1 through L5 was noted.  An injection of Toradol for pain was provided.  R. 285, 319. Plaintiff continued to report back pain in September 2009 and continued taking prescribed medication for back pain and anxiety.  R. 317-18.

In November 2009, Plaintiff reported having back pain with muscle spasm for several days after strenuous work involving moving furniture.  *See also* n. 4, *infra*.  A Toradol injection for pain control was administered.  R. 316.

In December 2009, Plaintiff complained of constant back pain and was administered an injection of Toradol in addition to her other medications.  R. 314.

On March 4, 2010, Plaintiff's treating Advanced Registered Nurse Practitioner (ARNP), James M. Bryan, completed a Residual Functional Capacity Questionnaire, opining Plaintiff could stand or walk up to two hours daily and sit up to two hours daily "in a normal workday," and could lift up to 10 pounds occasionally.  R. 336.  This was a check-off form.  The ALJ characterized this form as "a non-standard form."  R. 18.

By checking appropriate items, Mr. Bryan opined that Plaintiff could use her hands for simple grasping, but not for pushing and pulling and fine manipulation.  He further opined that Plaintiff could not bend, squat, crawl, or climb, is not able to reach above her shoulder level, and cannot sustain activity at a pace and with the attention to task as would be required in the competitive work place.  Plaintiff could not be expected to attend any employment on an 8 hour/5 days a week basis.  Mr. Bryan agreed that Plaintiff had a non-exertional impairment that substantially restricted her ability to function based on "chronic low back pain."  Limitations were noted as "lifetime." Mr. Bryan made no other legible remarks on the two-page form.  R. 336-37.

On March 26, 2010, supervising physician Eugene Charbonneau, D.O., stated: "I agree with my ARNP's findings."  R. 336-37.  (The ALJ stated that "Dr. Charbonnea[u] agreeably endorsed Mr. Bry[a]n's form-limited 'findings.'"  R. 18.  Among the factors the ALJ considered in determining whether Plaintiff is disabled is "Dr. Charbonneau's ostensible status as the claimant's treating physician."  R. 19.  *See also* R. 38 when Plaintiff confirmed she treats with Dr. Charbonneau.)

On March 18, 2010, Plaintiff reported her low back pain is getting worse, with radiation down her left leg or both legs.  Toradol injections were provided for pain twice that month, and an MRI requested.  R. 341-42.

On March 23, 2010, an MRI of the lumbar spine was completed and the following impressions were noted:

1.  Severe degenerative disc disease at level of L4-5, s/p (status post) laminectomy present at those levels.

2.  At the level of L1-2, slight asymmetric disc bulge, worse in the right lateral recess.

3.  At the level of L3-4, central disc bulge present.  However, the intervertebral neural foramina appear to be patent bilaterally.

4.  Marked spondylosis is present.  R. 344.

On April 14, 2010, Plaintiff reported aggravated low back pain and muscle spasms.  She reported caring for her mother.  An injection and medications were provided.  R. 340.

On May 11, 2010, Plaintiff reported low back pain and muscle spasms.  On examination, it was noted that Plaintiff had a bulging disc at L1-L2.  Plaintiff received an injection of Toradol for pain.  R. 339.

On July 28, 2010, Plaintiff complained of back pain.  Plaintiff reported that she drove to Ohio and back.  R. 357.[3]

---

[3] During the hearing before the ALJ, Plaintiff explained that she did not "go all the way to Ohio."  Rather, she went to Kentucky with a woman who rents a trailer from Plaintiff's mother and whose father was in the hospital.  They drove Plaintiff's truck and made frequent stops.  They stayed overnight because Plaintiff could not go further and then returned so Plaintiff could go to the doctor.  Her passenger flew back.  Except for

On October 7, 2010, Plaintiff was seen at the clinic, in part, for a face-to-face evaluation for disability.  R. 356.

Dr. Charbonneau completed a Lumbar Spine Residual Functional Capacity Questionnaire.  Dr. Charbonneau noted that Plaintiff was a patient since January 2008. R. 349.  He also noted Plaintiff's low back pain, bulging disc, radiculopathy and radiation into her hip and leg.  Dr. Charbonneau referenced the March 2010, MRI report.  R. 349. This form contains narrative responses and check marks where applicable.  R. 349-53.

Plaintiff was noted to have significant pain of 6/10 at rest, increasing to 10/10 with physical activity.  R. 349.

Dr. Charbonneau noted Plaintiff's symptoms are reduced range of motion, positive straight leg raising test, reflects changes, tenderness, muscle spasm, muscle weakness, and impaired sleep.  R. 350.  He opined Plaintiff could rarely lift less than ten pounds, walk one block without pain or rest, sit for ten minutes before needing to get up, and stand for five minutes at a time without changing position, and could sit, stand or walk for less than two hours total in an eight-hour workday.  R. 350-51.  However, Plaintiff would also need to change positions at will, and would "often need" unscheduled breaks during an eight-hour day and rest, on average, "12-14 hours" before returning to work.  R. 351.  With prolonged sitting, Plaintiff's legs should not be

---

this trip, and other than traveling to Tallahassee or Panama City, she has not taken any trips out of the Bristol, Florida, area.  R. 56-58.

elevated because it causes low back pain.  *Id.*  Plaintiff should never twist, stoop or

band, crouch or squat, or climb ladders, and rarely climb stairs.  R. 352.

Dr. Charbonneau did not respond to an item that asked whether Plaintiff's

impairments were likely to produce good and bad days, R. 352, although he opined that

Plaintiff would be absent from work more than four days a month, and that Plaintiff is in

"constant pain" which "causes her anxiety and depression, [increased] anxiety

[increased] pain."  R. 352.  Dr. Charbonneau determined that Plaintiff had significant

limitations in doing repetitive reaching, handling (grasp, turn or twist objects), or

fingering (fine manipulation) and indicated that Plaintiff could use her right and left

hands, fingers, and arms five percent during an eight-hour workday on a competitive

job.  R. 352.

On November 22, 2010, Dr. Charbonneau provided a checkmark to the left of

"Does meet listing 1.04" and provided the following as the medical basis for this

conclusion: Plaintiff "suffers from significant DDD [degenerative disc disease]

[throughout] lumbar spine. . .  [Patient] complains of radiation to appropriate associated

dermatomes of lower extremities. . .  [Plaintiff] has evidence per MRI of significant

pathology of lumbar spine."  R. 369.  *See* R.19 for the ALJ's negative assessment of

Dr. Charbonneau's findings and ultimate opinion.

## B.    Evidence from Consultative Examinations

On June 15, 2009, Plaintiff was examined by psychologist George Horvat, Ph.D.,

at the Commissioner's request.  Plaintiff's chief complaint was depression and physical

problems, i.e., she reported having "'constant back pain'" and that she could not "'work

due to it.  No one will hire me due to the bad back.'"  R. 211.  Dr. Horvat noted Plaintiff's "motor activity was slowed," and her "facial expression was depressed" although her eye contact was normal.  "Her posture and gait were normal, and her motor activity was slowed."  R. 211.

On examination, Plaintiff's "intelligence level and her fund of knowledge appeared to be average, based upon verbal and math skills demonstrated during the interview."  R. 212.  Plaintiff was unable to calculate serial sevens, and only able to calculate serial threes with five calculations in one minute and nine seconds with no errors by counting on her fingers."  R. 212.  Dr. Horvat opined that Plaintiff's "illness appears to be her main stressor, and her coping ability was overwhelmed.  Her skill deficits are in the area of activities of daily living, and her family is her main support.  Her social judgment is normal, but she isolates due to her illness."  R. 213.  His diagnosis was major depressive disorder, recurrent, moderate, and pain disorder.  Plaintiff's current GAF was 60.  Dr. Horvat concluded: "She is capable of handling finances.  If she can be cleared physically, there are no psychological reasons why she cannot work.  Her psychological treatment program can be scheduled around her work commitments."  R. 213.  *See also* R. 282 where Dr. Lyon agreed that "there were no psychological reasons" Plaintiff "could not work."

On June 18, 2009, Plaintiff was examined by Dr. Faruqui.  *See* pp. 5-6, *supra* for Dr. Faruqui's description of Plaintiff's medical history.  R. 258-61.  Dr. Faruqui had some of Plaintiff's clinic records, but did not "have any record from the consultant and [no] record of tests she has had in the past."  R. 260.

Plaintiff reported to Dr. Faruqui "that she can sit for about 10-15 minutes and then starts having pain. Changing position eases pain sometimes." R. 259. "She can stand for about 20-minutes and has pain in low back and sometimes radiates to left leg and like her left leg will give out under her." "She can walk for about 200-300 yards. She can walk for five to ten minutes at a time and then she has to rest a couple of minutes and then she can walk another five to seven minutes." "When she goes for shopping she usually leans on [a] buggy. She can shop for about 30-45 minutes on a slow pace. At home she has [sic] her mother doing dishes, which she can do for about five minutes. She takes a lot of time because she is slow. She cannot do vacuuming or cleaning and her sister usually does that." R. 259. "

Dr. Faruqui noted that Plaintiff was obese, looked somewhat depressed, although her speech and hearing were normal. R. 260.

Upon examination, Plaintiff's surgical scar was tender to touch with paraspinal muscle tenderness greater on the left with no spasm; minimal bilateral knee crepitans (otherwise extremities exam was unremarkable); was unable to perform lumbar extension; was leaning slightly forward when walking; could only squat with assistance; and had difficulty with toe and heel walking. She could "perform fine manipulations without problems." Pain was noted in the right groin area and pain was present in the left low back with a left straight leg raise, along with low back pain when the left hip flexion and rotation was performed. R. 261.

Dr. Faruqui noted that Plaintiff's exam was "unremarkable except slight tenderness on percussion of the back," and that she "has some low back pain on movement of left leg."  R. 261.

## C.     Evidence from Non-Examining Agency Consultants

On July 8, 2009, Robert Steele, M.D., a non-examining medical consultant, performed a Physical Residual Functional Capacity Assessment based on his review of available medical records.  R. 262-69.  Dr. Steele noted that Plaintiff had degenerative disc disease (DDD) and chronic lower back pain and two prior surgeries.  R. 263.

Dr. Steele opined Plaintiff could perform light exertional activity or light work, subject only to several postural and environmental limitations such as not more than occasional climbing of ropes, ladders, or scaffolds; not more than frequent stair/ramp climbing, stooping, kneeling, crouching, or crawling; and avoidance of concentrated exposure to vibration.  R. 264-66.  Dr. Steele agreed that Plaintiff's symptoms are attributable to a medically determinable impairment and that the severity of the symptoms and alleged affect on function is consistent with the total medical and nonmedical evidence.  R. 267.

On July 22, 2009, Richard K. Lyon, Ph.D., a non-examining psychologist, completed a Psychiatric Review Technique.  R. 270-83.  Dr. Lyon found that Plaintiff's medical impairment(s) were "not severe."  R. 270.  Under functional limitations caused by Plaintiff's mental impairments, Dr. Lyon opined that her activities of daily living were not restricted; that she had no difficulties in maintaining social functioning; that she had no difficulties in maintaining concentration, persistence, or pace; and that she had

experienced no extended episodes of decompensation.  R. 280.  The evidence did not

establish the presence of "C" criteria of the Listings.  R. 281.  Dr. Lyon referred to

Dr. Horvat's June 15, 2009, examination.  R. 282.

On October 14, 2009, David Guttman, M.D., a non-examining medical

consultant, also performed a Physical Residual Functional Capacity Assessment on

*reconsideration* of Plaintiff's injury.  R. 290-97.  Like, Dr. Steele, Dr. Guttman opined

that Plaintiff could perform light exertional activity, but, regarding postural limitations,

noted "occasionally" for every category, e.g., balancing, stooping, etc., whereas

Dr. Steele marked the "frequently" box in every category except ladder/rope/scaffolds

regarding climbing for which he marked "occasionally.  R. 264.  Dr. Guttman did not

note any manipulative, visual, communicative, or environmental limitations.  R. 293-94.

Dr. Guttman found Plaintiff's symptoms to be credible.  He also reduced the current

RFC as noted above regarding postural limitations.  R. 295.

On October 14, 2009, Jane Cormier, Ph.D, a non-examining psychologist, also

performed a Psychiatric Review Technique on *reconsideration* of Plaintiff's injury.

R. 298-311.  Dr. Cormier, like Dr. Lyon, also found Plaintiff's mental impairment(s) were

"not severe."  R. 298.  In her assessment of Plaintiff's functional limitations,

Dr. Cormier, like Dr. Lyon, opined that her activities of daily living were not restricted;

that she had *mild* difficulties in maintaining social functioning and *mild* difficulties in

maintaining concentration, persistence, or pace; and that she had experienced no

extended episodes of decompensation.  R. 308.  Evidence did not establish the

presence of the "C" criteria.  R. 309.  No reports of worsening were noted at the

reconsideration level.  R. 310.  Dr. Cornier concluded "[u]pdated AP notes suggest physical issues are primary" and that "[c]laimant continues to be physical [sic] limited to some extent, but has the mental ability to perform routine ADL's within her physical restrictions.  There is no indication of a severe mental impairment at this time."  R. 310.

**D.     Testimony from the Evidentiary Hearing**

   **Carolyn D. Johnson (Plaintiff)**

At the start of the hearing, the ALJ stated that Plaintiff had no "past relevant work," which was confirmed by Gail E. Jarrell, the vocational expert (VE) who testified during the hearing.  R 33, 36, 62.

Plaintiff was 50 years old at the time of the hearing.  R. 68.  Plaintiff has a ninth grade education and did not get a GED.  R. 61.

Plaintiff last worked in 1985 and then prior to 1990, she worked at the "Thrifty Nickel" in Panama City, although the length of time is not stated, and perhaps "a couple of little jobs," but nothing significant.  R. 46, 50.  While working in 1985, Plaintiff fell against the sink and injured her back.  R. 50.

Without objection, the ALJ identified several "medically determinable impairments" including disc degenerative disease, status post-total laminectomy and spinal fusion, hypertension, hyperlipidemia, depression, anxiety, obesity, and allergic rhinitis, and that Plaintiff contended she met Listing 1.04 and no other Listing.  R. 36.

Plaintiff stated that her back pain is the basis for her disability claim and that it is her back pain and leg pain (mostly the left leg) resulting from her sciatic nerve that keeps her from working.  R. 38.  During examination by the ALJ, Plaintiff stated that the

main reasons she cannot work is she "can't hold long enough to do it with [her] back" because of her back pain.  R. 61.

Plaintiff says she cannot afford to go to a doctor other than Dr. Charbonneau. R. 43.

Plaintiff was asked a series of questions in light of Dr. Charbonneau's responses on the RFC questionnaire.  R. 349-53.  For Plaintiff, some days are worse than others. She can walk without rest about a city block.  When she shops and walks up and down the aisles, she stops frequently and "kind of lean[s] against the buggy," i.e., uses the buggy for support.  R. 39.  She usually shops at Wal-Mart in Bristol.  R. 46-47.

Her ability to sit for any length of time depends on whether she is having a good or bad day.  If it is a bad day, it is hard for "her to get anyway [sic] to get any relief. [She] can sit, maybe 25, 30 minutes at the most in one spot."  Then she has to either get up or "lay down on the bed."  R. 39, 51.  During the hearing, Plaintiff was leaning on the armrest because her back hurt.  R. 39-40.  She agreed that she also has to move about every hour.  R. 40.  On a bad day, she cannot do anything, including pushing. R. 48.

Plaintiff can write with a pen or pencil and pick up coins, but has trouble reaching over her head with both arms on a bad day because "it pulls on [her] back."  On a good day, whether she can raise her arms above her head depends whether the object is heavy and, if it is, she cannot do it, again because it pulls on her back.  R. 49.

Plaintiff can lift two gallons of milk.  On a good day, she can squat down and pick something up if she has something to hold onto.  R. 40.  Also, on a good day, she can pick up and move a chair, but not a recliner.  R. 55.[4]

She has a lot of bad days, sometimes two or three days a week, sometimes a week, but nothing in particular brings on an episode.  On average, she has bad days "over half the month."  R. 40-42.  On a bad day, she stays in bed for a little while until she can get up and move about.  On these days, she is in a bad mood because of the pain.  R. 42-43.

Plaintiff drives.  She drove, by herself, approximately 50 miles in about an hour to Tallahassee from Bristol the morning of the hearing.  She stopped once for "just a minute or two" to stretch.  Driving back and forth will make her tight and then she will take medication and "lay down for a little while" when she returns to Bristol.  R. 43, 48, 51.  Plaintiff drives a Mercury Mountaineer that has a "little running board on the side."  R. 52.  See n. 3, supra, regarding Plaintiff's drive to Kentucky.

Plaintiff lives in a house with her mother and sister.  R. 43, 52.  She has lived with her mother since 1985.  R. 50.  Her mother broke her hip and Plaintiff brings "her water and stuff," but her sister, when close by, does the majority of assistance, including taking care of the house.

---

[4]  The ALJ referred Plaintiff to a November 2009, progress note when Plaintiff reported having back pain with muscle spasm for several days after strenuous work involving moving furniture.  R. 55-56, 316.  Plaintiff explained that she "was trying to move [her] bed out because [she] had to have a new bed because" her other bed was old and she also had to "scoot [her] dresser, and all that around."  R. 55-56.

Plaintiff stopped mowing (using a riding mower) the grass "[a]bout two years ago," 2009.  R. 53.  At the time, her sister and "brother w[ere] helping too."  R. 54. Plaintiff's sister has mowed the grass since that time.

Plaintiff never lifts her mother.  She cooks a little, like a quick meal, e.g., an egg sandwich, or she "can stand at the stove long enough to cook it," or, on bad days, sit on a stool near the stove in the kitchen.  R. 44-45.  But she cannot stand for long periods of time and cook a big meal.  R. 45.

Plaintiff does her own laundry.  R. 53.  Plaintiff has problems putting her shoes on.  She rarely has a good night's sleep.  R. 45-46.

Plaintiff does not go to church or belong to any social clubs.  She has tried fishing without much success.  She goes on a motor boat if she can, but not in 2010.  She went fishing last year and one or two times in 2010.  She fished from the bank with a rod and reel and cleans and eats the fish she catches.  R. 58-60.

### Gail E. Jarrell (vocational expert (VE))

The ALJ found that Plaintiff had additional postural limitations and, as a result, consulted a vocational expert, Ms. Jarrell.  (R. 23).

Plaintiff's counsel stipulated to the credentials of Ms. Jarrell.  R. 61.  Ms. Jarrell had no personal or professional contact with Plaintiff.  Ms. Jarrell responded affirmatively when asked if her testimony would be based on her knowledge, education, training and experience consistent with the Dictionary of Occupational Titles (DOT). R. 62.

After advising Ms. Jarrell that he concluded that "there is no past relevant work," the ALJ asked Ms. Jarrell the following hypothetical question:

> [a]ssume an individual with the claimant's age and education, who has no past relevant work experience, but who could work at the light exertional level, all postural limitations are occasional, could you provide me with some representative samples of the type of work that such an individual could do in the national economy. . .[a]s well as the region?  R. 62.

The ALJ clarified his question in response to Ms. Jarrell's inquiry whether Plaintiff could have a sit-stand option, to wit:  "No, no, no, light work.  I said all postural limitations, that's climbing, balancing, stooping, kneeling, crouching, and crawling?"  There was no objection to the hypothetical or the ALJ's clarification.  R. 63

Based on the hypothetical, Ms. Jarrell opined that such an individual would be able to work as a *companion* because it is light, "with an SVP [Specific Vocational Preparation Level] of three, it's semi-skilled," with a DOT number of 309.677-010.

She stated there are approximately 3,490 light unskilled companion jobs and approximately 2,991 light semi-skilled companion jobs in Florida.  In the United States, there are approximately 49,322 unskilled-light companion jobs and approximately 163,441 semi-skilled companion jobs.  R. 63-64.  Ms. Jarrell stated that the DOT does not have a listing number for light unskilled companion jobs, but that she was relying on the Occupational Employment Quarterly, 2nd quarter (2010) for her job numbers, which related to the same DOT number.  R. 64.[5]

---

[5]  The ALJ transposed the numbers of these companion jobs existing in Florida and the United States.  R. 24.

The ALJ asked Ms. Jarrell for "one other representative example" in light of his hypothetical question and Ms. Jarrell opined that "such an individual would be able to work as a cashier checker or in a retail trade," which is identified under DOT number 211.462–014 as a light semi-skilled job (SVP 3).  She identified approximately 83,100 such jobs existing in Florida and approximately 1,324,634 such jobs existing in the United States.  R. 64.

The ALJ provided Ms. Jarrell with a second hypothetical, to wit:

[t]he individual with the claimant's age, education, with no prior work experience, who could work at the sedentary exertional level, would could [sic] only occasionally push or pull bilaterally, all postural limitations of climbing, balancing, stooping, kneeling, crouching, crawling are all occasional, who could only occasionally perform bilateral overhead reaching.  With those limitations, would there be work for such an individual in the regional and national economy? R. 64-65.

There was no objection to the hypothetical.

Based on this hypothetical, Ms. Jarrell opined that such a person could perform work "at the sedentary level."  At this sedentary level, Ms. Jarrell deviated from the DOT because she only gave "the numbers for general office clerk, for sedentary unskilled and sedentary semi-skilled.  The DOT has general office clerk at light" with a DOT number of 209.562-010, a SVP of three, and designated as semi-skilled.  R. 65. According to Ms. Jarrell, there are approximately 6,233 sedentary, unskilled general office clerk jobs in Florida and approximately 47,786 sedentary, semi-skilled general office clerk jobs in Florida.  In the United States, there are approximately 98,235 sedentary, unskilled general office clerk jobs and approximately 753,132 such sedentary, semi-skilled jobs.  R. 66.  Ms. Jarrell clarified that all of these numbers were

listed under the general office clerk classification and also included sedentary, unskilled work as an addresser, which is identified as DOT number 209.587-010, with a SVP of two. R. 66-67. Ms. Jarrell did not perform an independent study regarding the numbers of available jobs. They were just noted under general office clerk. R. 67.

Under general office clerk, Ms. Jarrell stated there are sedentary, semi-skilled jobs (with a SVP of three and a DOT number of 209.587-014) as a credit-card clerk and sedentary, semi-skilled jobs (with a SVP of three and a DOT number of 209.687-022) as a sorter. R. 67.

In response to a question posed by the ALJ, Ms. Jarrell confirmed that her testimony was consistent with the DOT with the exceptions of the items identified above. R. 68.

## V.    LEGAL ANALYSIS

### I.

Plaintiff argues that the ALJ failed to properly evaluate the medical opinions of Dr. Charbonneau, and Mr. Bryan, ARNP. Plaintiff first argues that the ALJ should have given more weight to their opinions. Doc. 16 at 10-17.

Acceptable medical sources provide evidence in order to establish whether a claimant has a medically determinable impairment. These medical sources include licensed physicians (medical or osteopathic doctors), licensed or certified psychologists, and others. *See* 20 C.F.R. § 416.913(a). In addition to evidence from the acceptable medical sources, evidence from other sources may be considered to show the *severity*

of the claimant's impairment and how it affects their ability to work, and these other sources include nurse-practitioners.  20 C.F.R. § 416.913(d)(1).

When considering medical opinions, the following factors apply for determining the weight to give to any medical opinion: (1) the frequency of examination and the length, nature, extent of the treatment relationship; (2) the evidence in support of the opinion, i.e., "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight" that opinion is given"; (3) the opinion's consistency with the record as a whole; (4) whether the opinion is from a specialist and, if it is, it will be accorded greater weight; and (5) other relevant but unspecified factors.  20 C.F.R. § 416.927(d).

The opinion of the claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary.  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).  This is so because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."  20 C.F.R. § 416.927(d)(2).

The reasons for giving little weight to the opinion of the treating physician must be supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992), and must be clearly articulated.  Phillips v. Barnhart, 357 F.3d 1232, 1241 (11th Cir. 2004).  "The Secretary must specify what weight is given to a treating physician's

opinion and any reason for giving it no weight, and failure to do so is reversible error."
MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986).

     The ALJ may discount a treating physician's opinion report regarding an inability to work if it is unsupported by objective medical evidence and is wholly conclusory. Edwards v. Sullivan, 937 F.2d 580, 583-84 (11th Cir. 1991).  Stated somewhat differently, the ALJ may discount the treating physician's opinion if good cause exists to do so.  Hillsman v. Bowen, 804 F. 2d 1179, 1181 (11th Cir. 1986).  Good cause may be found when the opinion is "not bolstered by the evidence," the evidence "supports a contrary finding," the opinion is "conclusory" or "so brief and conclusory that it lacks persuasive weight," the opinion is "inconsistent with [the treating physician's own medical records," the statement "contains no [supporting] clinical data or information," the opinion "is unsubstantiated by any clinical or laboratory findings," or the opinion "is not accompanied by objective medical evidence."  Lewis, 125 F.3d a1436, 1440 (11th Cir. 1997); Edwards v. Sullivan, 937 F.2d at 583, citing Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987).

     If an ALJ rejects a treating physician's opinion, he must give explicit, adequate reasons for so doing.  MacGregor, 786 F.2d at 1053; Marbury, 957 F.2d at 841.

     Further, where a treating physician has merely made conclusory statements, the ALJ may afford them such weight to the extent they are supported by clinical or laboratory findings and are consistent with other evidence as to a claimant's impairments.  Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986).

     The ALJ considered Mr. Bryan's March 4, 2010, Residual Functional Capacity

Questionnaire, in which Mr. Bryan "checked-marked a short list of preprinted items," noting Plaintiff's impairments, identifying "chronic low back pain" as the impairment that "substantially restrict[ed] the claimant's ability to function."  The ALJ also noted Dr. Charbonneau's agreement with Mr. Bryan's findings.  R. 18, 336-37.

The ALJ also considered Dr. Charbonneau's Residual Functional Capacity Questionnaire.[6]  The ALJ characterized this questionnaire as a "checked-marked" and "longer list of preprinted items on another non-standard form," "ostensibly provided by the claimant's attorney representative." R. 19, 349-53.

The ALJ considered these statements "as they address the nature and severity of the claimant's impairment(s), and not as they address disability, [RFC], or satisfaction of listing criteria, issues ultimately reserved to the Commissioner per Social Security Ruling 96-5p."  The ALJ gave "less than significant weight" to these statements in part because they were "form-limited and conclusory assessments."  The ALJ also gave "less than persuasive" weight to these statements based on Dr. Charbonneau's "ostensible status as the claimant's treating physician; Mr. Bryan's "status as a nurse practitioner (not an acceptable medical source)"; the conclusory nature of Dr. Charbonneau's assessments "providing very little, (if any) explanation of the objective medical evidence and clinical findings relied on in forming said opinions"; and

---

[6] Dr. Charbonneau noted that Plaintiff's diagnoses included low back pain, bulging discs, degenerative disc disease, hypertension, hyperlipidemia, and high cholesterol.  He also reported the results of blood tests and the March 2010 MRI to support his conclusion.  Low back pain with radiculopathy to both legs and an increase in pain with any physical task were noted as well.   Boxes were checked indicating, in part, reduced range of motion, positive straight leg raising test, etc.  Other items were circled.  R. 349-51.

noted inconsistencies.  R. 19.

Plaintiff sought medical care from health care practitioners at the clinic.  While most of the progress notes are difficult to read, it appears that Plaintiff sought and received evaluations and treatment from Mr. Bryan, not Dr. Charbonneau, notwithstanding references in this Record, *see*, *e.g.*, R. 19, 38, to Dr. Charbonneau as Plaintiff's treating physician.

Dr. Charbonneau did not provide "a detailed, longitudinal picture of" Plaintiff's impairment.  Based on a review of the record, it does not appear that Dr. Charbonneau had a lengthy or frequent treatment relationship with Plaintiff.

Even discounting the nature of the form used by Dr. Charbonneau and the negative weight given to Dr. Charbonneau's assessment, *see generally* Teague v. Astrue, 638 F.3d 611 (8th Cir. 2011), the ALJ's overall determination of the weight and credibility to be given to Dr. Charbonneau's assessment is supported by substantial evidence.

Also, notwithstanding Mr. Bryan's several-year relationship with Plaintiff as reflected in the progress notes, the ALJ properly discounted Mr. Bryan's assessment provided in the form regarding the severity of Plaintiff's impairments and how any such impairment affected Plaintiff's ability to work because the form did not contain narrative descriptions or objective medical findings to support the opinion.  *See* Osterhoudt v. Astrue, No. 8:10-cv-T-TGW, 2011 U.S. Dist. LEXIS 5781, at *7 (M.D. Fla. Jan. 14, 2011); 20 C.F.R. § 416.913(d)(1).

II.

Next, Plaintiff argues that the ALJ improperly rejected Dr. Charbonneau's opinion that Plaintiff met the requirements of Listing 1.04.  *See* 20 C.F.R. pt. 404, subpt. P, app. 1.  If a claimant has an impairment that is listed in or equal to an impairment listed in Appendix 1, a finding of disability is made at step three without considering the claimant's age, education, or work experience.  20 C.F.R. § 404.1520(d).  The disability determination is a sequential evaluation, with the step three determination occurring before the determination of RFC and the ability to perform past or other work based on the RFC determination.  20 C.F.R. § 404.1520(a)-(g).

In order to meet Listing 1.04, Plaintiff must show a disorder of the spine, such as degenerative disc disease, "resulting in compromise of a nerve root (including the cauda equina) or the spinal cord, with" either evidence of nerve root compression under subsection 1.04 A *or* spinal arachnoiditis, confirmed by an operative note or pathology report or specific clinical findings under subsection 1.04 B *or* lumbar spinal stenosis under subsection 1.04 C.

On November 22, 2010, Dr. Charbonneau checked a box indicating that he had reviewed the requirements of Listing 1.04 and that Plaintiff met that Listing. Dr. Charbonneau provided his medical basis for this conclusion: "[Patient] suffers from significant DDD [degenerative disc disease] [throughout] lumbar spine. . .  [Patient] complains of radiation to appropriate associated dermatomes of lower extremities. . . [Plaintiff] has evidence per MRI of significant pathology of lumbar spine."  R. 369.

The ALJ noted the results of the March 2010 MRI of Plaintiff's lumbar spine that stated in part:  "Axial images obtained at the level of L1-2 show that there is a

symmetric disc bulge present, worse in the right lateral recess that *could* be causing some compression of the right nerve root."  (emphasis added).[7]   The record supports the ALJ's conclusion that the results of the March 2010 MRI did "<u>not</u> constitute persuasive evidence of 'compromise of a nerve root or the spinal cord' in this case." R. 16.  (emphasis in original).   The record also supports the ALJ's ultimate rejection of Dr. Charbonneau's impairment rating under Listing 1.04 because Plaintiff's albeit severe impairments, R. 15, did not meet the specific medical criteria under Listing 1.04.  *See generally* <u>Sullivan v. Zebley</u>, 493 U.S. 521, 530 (1990).

III.

Plaintiff also suggests that the ALJ should have made further inquiry as to the reasons for Dr. Charbonneau's statement.  Doc. 16 at 16-17.

An ALJ has a clear duty to fully and fairly develop the administrative record. <u>Brown v. Shalala</u>, 44 F.3d 931, 934 (11th Cir. 1995).  "Even though Social Security courts are inquisitorial, not adversarial in nature, claimants must establish that they are eligible for benefits."  <u>Ingram v. Comm'r of Soc. Sec. Admin.</u>, 496 F.3d 1253, 1269 (11th Cir. 2007).  The regulations require that the Commissioner re-contact, e.g., a treating physician, only if the evidence is inadequate to determine whether or not the claimant is disabled.  20 C.F.R. § 416.912(e).  *See also* SSR's 96-5p and 96-2p.  However, the ALJ is not required to order additional examinations if the evidence in the record is sufficient to allow for an informed decision.  <u>Ingram</u>, 496 F.3d at 1269.

---

[7] Dr. Charbonneau referred to the March 2010 MRI, R. 349, but not the 1991-post-surgical MRI, R. 202-03, referred to in Plaintiff's memorandum at 16.

The ALJ had sufficient information to determine that Plaintiff's impairments did not meet the requirements of Listing 1.04.  Therefore, the ALJ was not required to re-contact Dr. Charbonneau.

IV.

Plaintiff also contends that the ALJ's credibility determination regarding Plaintiff is not supported by substantial evidence.  Doc. 16 at 17-19.  Plaintiff suggests that the ALJ's references to, and emphasis on, several of Plaintiff's daily living activities, such as Plaintiff's limited furniture-moving, fishing, yard work, cooking, one-time trip to Kentucky, and driving to and from the hearing, and ultimate conclusions regarding Plaintiff's credibility are overstated and do not support a determination that Plaintiff is not disabled.  *Id.*

The ALJ may consider a claimant's daily activities when evaluating subjective complaints of disabling pain and other symptoms.  Macia v. Bowen, 829 F.2d 1009, 1012 (11th Cir. 1987); 20 C.F.R. § 929(c)(3)(i).   *But see* Lewis v. Callahan, 125 F.3d 1436, 1441 (11th Cir. 1997) ("participation in everyday activities of short duration, such as housework or fishing" does not disqualify a claimant from disability).

The credibility of the claimant's testimony must also be considered in determining if the underlying medical condition is of a severity which can reasonably be expected to produce the alleged pain.  Lamb v. Bowen, 847 F.2d 698, 702 (11th Cir. 1988).  After considering a claimant's complaints of plain, an ALJ may reject them as not credible.  *See* Marbury, 957 F.2d at 839, citing Wilson v. Heckler, 734 F.2d 513, 517 (11th Cir. 1984)).  If an ALJ refuses to credit subjective pain testimony where such testimony is

critical, the ALJ must articulate specific reasons for questioning the claimant's credibility. *See* <u>Wilson v. Barnhart</u>, 284 F.3d 1219, 1225 (11th Cir. 2002).  Failure to articulate the reasons for discrediting subjective testimony requires as a matter of law, that the testimony be accepted as true.  *Id.*

The ALJ noted several inconsistencies in support of his credibility findings regarding Plaintiff.  In short, the ALJ found that several of Plaintiff's activities were not consistent with her allegations of disability.  *See, e.g.*, R. 17, 21-22.

After discussing Plaintiff's daily activities, the ALJ summarized some of the medical evidence of record, including but not limited to, the consultative medical examination of Dr. Faruqui, the March 2010 MRI, the evaluation forms used by Mr. Bryan and Dr. Charbonneau, Dr. Horvat's clinical interview of Plaintiff, and the other state agency physician and psychological consultant reports.  It was in light of this evidence and the ALJ's assessment of Plaintiff's daily activities that the ALJ made his credibility findings.

The ALJ concluded that based on a "combination of factors," Plaintiff's "statements concerning her impairments and their impact on her ability to work are only *partially* credible."  R. 22.  (emphasis added).  The ALJ determined that Plaintiff's statements regarding the limiting effects of her symptoms were not credible in light of the totality of the circumstances in the Record, not that her medically determined impairments "could [not] reasonably be expected to cause the alleged symptoms." Stated otherwise, the ALJ indicated that the noted inconsistencies do not show a pattern of deceit, but they "call into question the general reliability," of Plaintiff's

estimation of her symptoms and functional limitations.  R. 22.

The ALJ's credibility determination of Plaintiff is supported by substantial evidence.

V.

Plaintiff argues that the ALJ erroneously found that Plaintiff could perform semi-skilled work at step five.[8]

The ALJ determined that Plaintiff's ability to perform all or substantially all of the requirements of a full range of light work has been impeded by additional limitations. "To determine the extent to which these limitations erode the unskilled light occupational base, [the ALJ] asked the vocational expert whether any jobs exist in the national economy which could be performed by an individual of the same age and with the same education and work experience as the" Plaintiff.  R. 23.  *See also* R. 62-63 for the hypothetical posed to Ms. Jarrell.  (Ms. Jarrell was present for Plaintiff's testimony.)

Based on the hypothetical, as clarified, Ms. Jarrell opined that such an individual would be able to work as a companion because it is light, albeit with a SVP of three-semi-skilled with DOT number 309.677-010.  She identified the number of such jobs in Florida and the United States.  R. 63-64.  (Plaintiff does not suggest that the hypothetical was insufficient.)  *See generally* Phillips v. Barnhart, 357 F.3d at 1240 n.4 .

_____

[8] Once the claimant proves that she cannot return to her past relevant work, the burden shifts to the Commissioner to show that the claimant can perform other jobs that are significant in number in the national economy, considering age, education, and work experience.  Gibson v. Heckler, 762 F.2d 1516, 1518-19 (11th Cir. 1985).  It is the Commissioner's burden at step five of the disability determination to demonstrate that a claimant can perform a significant number of jobs in the national economy.  Phillips v. Barnhart, 357 F.3d 1232, 1237 (11th Cir. 2004).

Ms. Jarrell explained that the DOT does not have a listed number for light unskilled companion jobs and, therefore, she relied on the Occupational Employment Quarterly, 2nd quarter (2010) for her numbers, which reflects the same DOT number. R. 64.

Ms. Jarrell also opined that "such an individual would be able to work as a cashier or in a retail trade," which is identified under DOT number 211.462-014 as a light, semi-skilled job (SVP3).  She identified the approximate number of jobs in Florida and the United States.  R. 64.

The first issue is whether the ALJ erred at step five in finding that Plaintiff could perform semi-skilled jobs as a companion and cashier-checker.  Doc. 16 at 19-21.  In support of this point, Plaintiff contends that "the two jobs cited are semi-skilled, and pursuant to controlling regulations, cannot be performed by an individual with no past relevant work" and further that "the ALJ cannot rely on VE 'evidence that conflicts with Agency policy' regarding exertional and skill levels and transferability of skill levels" citing Social Security Ruling 00-4p.  Doc. 16 at 20.  The argument continues that because skill levels are defined by specific vocational preparation or SVP, and a SVP level of 3 is semi-skilled, not unskilled work, and because the companion and cashier-checker jobs have SVP's of 3, the ALJ erred in relying on the VE's testimony that these jobs are suitable for Plaintiff.

However, and assuming that Plaintiff is not otherwise disabled, the predicate for Plaintiff's argument is that she cannot perform any work other than unskilled work

because the ALJ found that Plaintiff had no past relevant work (and presumably because transferability of job skills is not at issue).[9]  *See* R. 23.

Defendant does not specifically address this issue in reference to Social Security Ruling 00-4p.  Rather, Defendant explained that the ALJ consulted with a VE, here Ms. Jarrell, in lieu of relying exclusively on the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2 (Grids), because the ALJ "found that Plaintiff had additional postural limitations."  Defendant summarizes the testimony of Ms. Jarrell. Doc. 17 at 14-16.

The ALJ concluded that Ms. Jarrell's "testimony pertaining to all other available jobs is consistent with the information contained in the [DOT], as supplemented by data contained in the Occupational Employment Quarterly, 2nd edition (2010)."  He also accepted and adopted Ms. Jarrell's testimony "per Social Security Ruling 00-4p."

R. 24.  (During the hearing, Ms. Jarrell explained the reasons for her use of the Occupational Employment Quarterly, R. 64, and Ms. Jarrell confirmed that her testimony was consistent with the DOT with the exception of the items identified. R. 68.  *See generally* Allen v. Astrue, No. 1:10cv445-TRM, 2011 U.S. Dist. LEXIS 97685, at *19-24 (M.D. Ala. Aug. 31, 2011) (finding no error where the ALJ made specific inquiries as to a conflict between the DOT and the vocational expert's testimony regarding his use of the numbers from the Occupational Employment Quarterly (2008)

---

[9] A similar legal argument has been rejected.  *See* Lincoln v. Astrue, No. 10-1861, 2012 U.S Dist. LEXIS 11825, at *9-11 (W.D. La. Jan. 11, 2012).

and addressed the conflict on the record).  As in <u>Allen</u>, Plaintiff's counsel was provided with the opportunity to ask questions related to Ms. Jarrell's consideration of the Occupational Employment Quarterly, or any other subject, and asked no questions regarding Ms. Jarrell's use of this source.  R. 61-68.)

At the very least, Ms. Jarrell's testimony provides substantial evidence to support a finding that there are significant numbers of unskilled companion jobs that Plaintiff could perform.  *See*, *e.g.*, <u>Johnson v. Chater</u>, 108 F.3d 178, 181 (8th Cir. 1997)(200 jobs at state level and 10,000 nationally, constitute a significant number); <u>Allen v. Bowen</u>, 816 F.2d 600, 602 (11th Cir. 1987) (finding 1,600 jobs in the State of Georgia and 80,000 in the national economy to be a significant number); <u>Summerall v. Astrue</u>, No. 3:10-cv-7-J-JRK, 2011 U.S. Dist. LEXIS 39009 (M.D. Fla. Mar. 31, 2011)(two unskilled jobs claimant could perform-order clerk and charge account clerk); 20 C.F.R. § 416.966(d) ("Work exists in the national economy when there is a significant number of jobs (*in one or more occupations*) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications.") (emphasis added).

Furthermore, there is no legal basis to reject the ALJ's determination that Plaintiff can perform semi-skilled work as a companion or cashier-checker based on the legal ground asserted by Plaintiff.  *See* n. 9, *supra*.

Plaintiff also argues that the ALJ erred in adopting Ms. Jarrell's testimony pertaining to Plaintiff's ability to perform several sedentary, semi-skilled jobs notwithstanding that the ALJ expressly did not find "that the evidence supported a

sedentary [RFC]," notwithstanding Ms. Jarrell's testimony.  R. 21.  The ALJ's findings are supported by substantial evidence.

Finally, Plaintiff argues that Plaintiff erred in not finding her disabled because she was 50 years old at the time of the hearing having turned 50 on August 21, 2010. Plaintiff asserts that based on the ALJ's decision, there are no light, unskilled jobs she can perform and that she would be disabled at age 50 even if she could perform only sedentary work.  Plaintiff further argues that "pursuant to Rule 201.09 [of the Grids], Plaintiff must be deemed disabled at age 50 (August 21, 2010) even if she is able to perform sedentary work."  Doc. 16 at 23-25.  *See also* Doc. 16 at 21-23 for Plaintiff's discussion of the ALJ's alternative step five finding and related sedentary jobs.

The ALJ determined that Plaintiff has the RFC "to perform a reduced range of light work as defined in 20 CFR 416.967(b)."  Doc. 10-2 at 17.  But, the ALJ found that Plaintiff's ability to perform all or substantially all of the requirements of a "full range of light work" "has been impeded by additional limitations."  Doc. 10-2 at 23.  Accordingly, and as discussed above, the ALJ asked Ms. Jarrell whether there were any jobs in the national economy which could be performed by Plaintiff given the noted limitations. R. 62.  In part, Ms. Jarrell was asked to consider Plaintiff's age (50) and education (ninth grade).  R. 61, 62, 68.  (The ALJ specifically inquired of Plaintiff as to her age at the time of hearing-50.  R. 68.)

20 C.F.R. § 416.963(d) provides: "If you are closely approaching advanced age (age 50-54), we will consider that your age along with a severe impairments(s) and limited work experience may seriously affect your ability to adjust to other work."  The

Grids, Rule 201.00(g) provides, in part, that "[i]ndividuals approaching advanced age (age 50-54) may be significantly limited in vocational adaptability if they are restricted to sedentary work."  However, the ALJ appropriately found that Plaintiff was not restricted to sedentary work.  As a result, Rule 2.09 of Table No.1, which pertains to a person of "closely approaching advanced age" with a maximum sustained work capability limited to sedentary work as a result of severe medically determinable impairment(s), would not apply to Plaintiff.

The ALJ considered Plaintiff's "closely advancing advanced age" of 50 in concluding, based in part, on the testimony of Ms. Jarrell that, at the very least, Plaintiff can perform a reduced range of light work including work as an unskilled companion. R. 23-24.  Therefore, the ALJ did not err in concluding that Plaintiff is not disabled in light of her age, severe impairments, and limited work experience.

## VI.    CONCLUSION

Considering the record as a whole, the findings of the ALJ are based upon substantial evidence in the record and the ALJ correctly followed the law.

Accordingly, pursuant to the fourth sentence in 42 U.S.C § 405(g), the decision of the Commissioner to deny Plaintiff's application for Social Security benefits is **AFFIRMED** and the Clerk is **DIRECTED** to enter judgment for the Defendant.

**DONE AND ORDERED** at Tallahassee, Florida, on May 15, 2012.


**s/    Charles A. Stampelos**
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**